JONES, Chief Judge,
dissenting:
I believe the court has misconstrued the Bemaley case. The majority opinion quotes from the opinion in 129 Ct. Cl. 159. It will be noted that the matter should be referred to *501 a trial commissioner for the purpose of determining whether, notwithstanding the language quoted, the plaintiff was on active duty service.
When it was finally disposed of by an opinion — 134 Ct. Cl. 874 — we held that the plaintiff should recover. We held that plaintiff was on extended active duty in fact, notwithstanding the recital “active duty for training” in the order.
In some respects the instant case is a stronger case for treating the period of service as “active duty service” than was the Remaley case, in which recovery was allowed. In the instant case the period of service was longer than in the Remaley case. Here there was nearly a year of service after the recall. If there were any doubt about the meaning of the “more than 30 days” provision the discussion of those Members of Congress in both bodies shows clearly that a case of this hind should be considered as coming within the meaning of active service, regardless of the wording of the orders. Congressman Edmiston in the House and Senator Barkley in the Senate, in explaining the bill, said that the bill was meant to exclude only Reserve officers who were called for two weeks’ training periods, but if they were called for more than thirty days they would be entitled to the benefits of the Act. Congressional Record 84th Cong., Part II, pp. 1439 and 2287.
In addition, I would allow recovery for the reasons stated in my dissent in Boraiko v. United States, 146 Ct. Cl. 814, 821 (1959), MacFarlane v. United States, 134 Ct. Cl. 755, 760 (1956), and Holt v. United States, 134 Ct. Cl. 801, 805 (1956). Where, as in the instant case, there is no doubt that the disabled condition had its inception in the service and became disabling later, there should be retirement not later than the time it became disabling. But regardless of whether the court agrees with the latter basis of recovery, there is not the slightest doubt that if we are not to overrule the Remaley case the plaintiff is entitled to recovery.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
*502 1. Plaintiff served as an enlisted man, United States Army, from June 1, 1918, to December 1, 1918; was subsequently recalled to active duty as a captain, Officers’ Reserve Corps of the Army, January 13,1941; and was released from active duty on June 14,1946. He was transferred to tbe Honorary Reserve February 14, 1952, because it had been determined that he was physically disqualified for retention by reason of hypertension.
2. Orders were issued to plaintiff on September 5, 1947, as follows:
1. By direction of the President you are ordered to active duty training and assigned to Org Res Tng Det, Headquarters, Eastern Pennsylvania Military District, for record purposes only, with station as indicated in (a) below:
a. Station_ Carlisle Barracks, Pa.
b. School_The MP School
c. Class No. and Course_#1, MP Officers Advanced
d. Starting date of class— 13 October 1947
e. Date of rank_24 May 1946
f. Effective date of active duty_6 October 1947
g. Date you revert to inactive status-1 August 1948
h. Days of leave author-ized_22
jfc sj« if: #
The travel directed is necessary in the military service. Permanent change of station. 2181505 852-1601 P5 11-01:02 S18-102. * * *
The symbols in the above order relate to the following:
2181505: Appropriation symbol for “Organized Reserves, 1948.”
852: Operating agency code for Second Service Command, fiscal year of obligation 1948 designated by digit 8.
1601: Allotment number.
P511: Project account number for “Pay, Travel, and Allowances, and Other Expenses of Reserve Personnel Called to Duty for Training Purposes.”
01: Object class — personal services.
02: Object class — travel.
S18-102: Headquarters, Second Army, Fort George G. Meade, Md.
*503 Plaintiff reported pursuant to tlie above orders and served on active duty until August 1, 1948, when he was released from active duty and reverted to an inactive status.
3. Plaintiff was given a physical examination prior to his entry upon active duty on October 9, 1947, the report of which was generally negative and was endorsed “Qualified for General Military Service” on November 5, 1947.
4. After completing his tour of duty in August 1948, plaintiff returned to his former position as a sales representative of Max Chipen & Sons. However, in June of 1949, he resigned from that position because of ill health.
5. Plaintiff was given a final-type examination upon his release from his tour of duty. He called the examiner’s attention to his difficulty with double vision and his bladder ailment, but the report of medical examination is negative concerning the claimed conditions. A diagnosis of astigmatism was made and the examiner concluded that the individual was “not permanently incapacitated for general service.”
6. Plaintiff was advised by the Department of the Army on June 17, 1949, that his application for 90 days’ active duty training could not be considered because of lack of funds. On July 18, 1949, plaintiff made formal application for two weeks’ active duty, effective September 1,1949, and executed a certificate indicating that he considered himself physically qualified for military duty, with no physical defects or conditions which would preclude the performance of full military duty. An order was issued directing that plaintiff be placed on a short tour of duty, but this was canceled on August 23, 1949, because “Officer contacted and states that due to civilian commitments he will be unable to accept active duty training at the time specified.”
7. In early March of 1948, while on duty, plaintiff experienced double vision (diplopia), was treated at the Valley Forge Army Hospital Eye Clinic, and was immediately returned to duty. The eye condition was diagnosed as astigmatism. The ophthalmologist stated the eye changes were probably due to arteriosclerotic and hypertensive conditions. After plaintiff experienced some bladder trouble, he consulted a civilian physician, on April 10, 1948, and he *504 treated plaintiff for the trouble on several subsequent occasions. Neither the vision defect nor the bladder condition prevented plaintiff from performing his assigned duties, and he was able to complete his school course. The diplopia ceased with the substitution of new eyeglasses.
8. Plaintiff again experienced diplopia in the late fall of 1948 or early spring of 1949. In connection with his bladder trouble, a transurethral resection (prostatectomy) was done on August 26,1948, by Dr. Frank P. Massaniso. The plaintiff was given a neurological examination at the Naval Hospital, Philadelphia, on November 4, 1949. The report refers to the diplopia and the bladder difficulty, and the doctor commented as follows:
* * * He probably has an arteriosclerotic aneurysm but should be investigated for a tumor or for evidence of metastatic disease.
¡9. On November 4, 1949, a neurological examination was made by Commander Berry, the results of which were as follows:
Oranial Nerves: There is no anosmia. Discs are well outlined and of good color. Veins pulsate normally. The arteries show minimal increase in light reflex but no a.v. nicking. The right pupil is larger than the left by 2 to 3 mm., but both are round and regular, react promptly to light and in accommodation. The fields appear full, and the patient states that fields done by his local ophthalmologist were normal. The extra-ocular movements show the palpebral fissures normal and equal. Pupils in the midline. There is a paresis of the left external rectus muscle with nystagmoid jerking on lateral gaze. This is not a complete paralysis. There are some jerky movements of the eye balls on lateral gaze in either direction and a questionable nystagmus on right lateral gaze. Diplopia is noted on left lateral gaze beyond the midline. The corneal reflexes are equal. There is no disturbance of sensation over the face. The pterygoids and masseters are normally of good strength. There is a suggestion of flattening of the left corner of the mouth with minimal evidence of a true weakness, central in type. There is a good gag reflex bilaterally. The tongue protrudes in the midline with no weakness and no fibrillations. Air conduction is greater than bone conduction bilaterally. The left shoulder tends to lag slightly in elevation but *505 this is not too constant a finding. There may be a little weakness of the left trapezius muscles.
Motor: The left grip is slightly weaker than the right. There is no other focal weakness and the patient states that he fractured his left hand sometime in the past and apologizes for the weakness from this standpoint. There is no atrophy and no fasciculations are noted.
Coordination: There is no dyssynergia or dysmetria on finger-to-nose test or on supination-pronation of patting tests of the upper extremities. There is a hint of a tremor on heel-to-knee test bilaterally but this is not consistent. The gait and station are normal. There is no sway in the Romberg position. The patient can stand on either leg alone.
Sensation: There is no disturbance to pin, touch, vibration or position sensation.
Reflexes: The biceps, triceps and radial periosteal reflexes are over-active but equal. The Achilles and patellar reflexes are over-active, the left more so than the right. I could not obtain abdominal reflexes. There is a left Babinski with a left Chaddock response. The right response is equivocal.
Summary: The patient is a fifty-two year old Lieutenant Colonel in the Army Reserve who is seen as a Veterans Administration patient complaining of diplopia on lateral gaze to the left. At the present time, he is unemployed but has been working as a salesman and representative of a partner in a building concern. The patient claims that he was perfectly well until March of 1948 when he had diplopia in the right eye on looking to the right. This cleared after a few weeks. Approximately five months later after complaining of frequency of urination and impotence, he was operated upon and had a prostatectomy. I believe this, from his description, was a transurethral prostatec-tomy. According to the patient, there was no evidence of malignancy. In April of 1949, the patient began to have double vision again; this time on looking to the left and in his left eye. This symptom has been continuous since that time; it is possibly a little better than it was in April; it is only in the horizontal plane. The patient has had occasional headache in the left side of his head since March of 1948. He has had a total of 6 to 8 headaches, all periodic, of short duration, two to three minutes, except for one or two that lasted about possibly a total of three hours. He has not had any stiff neck or ptosis associated with these headaches *506 or at any other time. Because of his diplopia he had some of his front lower teeth removed and he had a tonsillectomy a short time ago. The only other illness is the flu during which he was unconscious for three to four days back in 1918. He has had head injury but this was many years ago and he was not particularly unconscious at that time as he recalls. The review of systems is essentially negative except as noted in his history and occasionally his left leg, especially at night, has been noted to jerk several times. This may be a spastic phenomena. The family history reveals that his mother had migraine headaches and died of a pneu-mococcus infection. The father died of peritonitis and his sister died postoperatively for an unknown disease.
IMPRESSION: This man shows on examination a blood pressure fluctuating between 140 and 160/over approximately 80. He has been known on taking frequent physical examinations for the Army service to have labile hypertension. There is minimal evidence of arteriosclerosis of the fundi. Pie shows by history a sixth nerve weakness on the right side which cleared spontaneously and a sixth nerve weakness on the left which has stayed with him. During all his physical examinations for the Army, no mention was made of any hyperactive reflexes; however, one of his local physicians did note it several months ago. He shows a questionable left facial weakness and left trapezius weakness and bilateral pyramidal track signs more on the left. This suggests a lesion in the brain stem region, probably getting both pyramids and the sixth nerve involvement from pressure in the basis pedunculi area. He frobably has an arteriosclerotic aneurysm but should e investigated for a tumor or for evidence of metastatic disease.
10. On June 23,1950, Lt. Comdr. E. G. Berry, at the Naval Hospital in Philadelphia, made the following comments concerning the plaintiff’s physical condition at that time:
Patient believes Tolserol has improved his urinary frequency and urgency to some extent, but still occasionally dribbles a bit in bed and has nocturia 1-3 times. He has some bilateral thigh aching and stiffness recently.
He was seen at Wills Eye Hospital by Dr. N. Schlezinger, who confirms the findings as previously noted with the addition of some evidence of convergence paralysis. He does not believe an aneurysm is the etiological agent, and does not recommend audiography. The etiology is probably vascular.
*507 Today be shows nystagmus on gaze to the right, vertical nystagmus on upward and downward gaze bilaterally. Lack of complete inward rotation on the right on conjugate gaze, but also on individual fixation. There is gross nystagmus on left lateral gaze in the left eye.
On fixation of the eyes with rotation of the head the findings are the same.
In summary, this man shows signs of nuclear involvement in the region of the oculomotor nuclei, and post, long, fasciculus as well as bilateral pyramidal tract signs. In all probability the etiology is vascular, al-through the possibility of a brain stem tumor is present.
Kx Nicotinic Acid, 100 mgm QID
Tolserol, 50 mgm 5 times daily.
11. Plaintiff was examined on several occasions from April to June 1950 at the Naval Hospital in Philadelphia. There appeared to be some improvement in his bladder difficulties and continued evidence of his diplopia. The doctors concluded, “* * * the etiology is vascular, although the possibility of a brain stem tumor is present.”
12. In June and July of 1951, plaintiff was examined by doctors of the Veterans Administration. No change in his vision or bladder difficulty was noted. However, mention was made of his unsteadiness of gait. The doctors were of the opinion that there was evidence of a disseminated process involving primarily the brain stem, best explained on a vascular basis, and they observed that “multiple sclerosis must be considered.”
13. Plaintiff was in the Veterans Hospital at Philadelphia from January 7 to January 16, 1952, and his condition was diagnosed as “disseminated sclerosis involving the brain stem.” This was the first definite diagnosis of multiple sclerosis made. Plaintiff was again admitted to the Philadelphia hospital for observation and examination. The final diagnosis was “disseminated process of the central nervous system (probable multiple sclerosis)” and he was discharged October 10, 1952. On June 28, 1953, he was hospitalized at the Germantown Hospital, Philadelphia, for a bladder neck obstruction, which condition is compatible with multiple sclerosis.
14. Dr. Albert J. Glass, Colonel, United States Army Med *508 ical Corps, was a witness for defendant in this action.[2] He graduated from the University of Maryland School of Medicine in 1932, was Assistant in Neurology, Johns Hopkins Hospital, 1938 to 1941, entered the military service in 1941, and has been continuously assigned in psychiatry and neurology to the date of his testimony at the trial of this claim. He is presently Psychiatric Consultant of Neurology and Psychiatry in the Office of the Surgeon General. He is a Fellow of the American Psychiatric Association and a Specialist in Neurology certified by the American Board of Neurology.
15. On being asked to give a statement concerning the disease multiple sclerosis, Colonel Glass testified, in part, as follows:
* * * [Djisseminated sclerosis or multiple sclerosis is an illness of unknown etiology which is characterized by the appearance of plaques or areas of degeneration in the central nervous system, multiple areas which produce symptoms depending upon which particular area of the central nervous system is involved.
It is characterized usually by an insidious onset, by periods of remission which may last for longer or shorter lengths of time and sometimes lengths of time measuring in years.
After repeated bouts of the activity of this illness usually the remissions become incomplete, more and more residual, difficulties remain and as its course runs on generally the individual becomes more and more incapacitated.
Early symptoms are often fleeting, so much so that frequently the diagnosis cannot be made early because the symptoms disappear.
Common early symptoms are paresthesias, areas of numbness and tingling which disappear and certain paralysis in arms and legs and certain episodes of giddiness and loss of balance, various eye symptoms like double vision or small islands of blindness called scotomata.
In fact, any function of the central nervous system may be interf erred with, bowel and bladder disturbances and so forth.
There is no known treatment for this illness. There are various theories about the cause which range from it being due to an infection, virus or otherwise, to its *509 being due to certain abnormal clotting tendencies of the blood, its being due to toxic causes which disturbs the myelin sheath of the nerves or being due to various spastic blood vessels going into spasm. None of these theories have been proved.
Treatment is symptomatic. There is no known precipitating cause although there are many concepts that it may be caused by stress or strain or attacks of infection of other kinds but none of this is substantiated. The knowledge about the illness has not progressed particularly in the last twenty or thirty years. Much is known about its clinical manifestations and course.
We know for example that it occurs mainly between the ages of twenty and forty although cases have been seen in people younger than twenty and in people older than forty.
There are some cases that occur in families but these are in the minority rather than in the majority.
It is seen in the north temperate zones such as England, the Scandinavian countries, the upper parts of this country and less common in the warmer climates.
Its pathology is pretty distinct. The nerve impulses are transmitted along what is known as axis cylinders. They are encased in the myelin sheath. The disease attacks the myelin which is a fatty envelope and this causes degeneration of this myelin sheath which breaks up and finally involves the axis cylinder or the actual transmitting arm of the nerve member itself.
It is for this reason that the individual can apparently have a remission because if the axis cylinder is not damaged nerve impulses can be transmitted and when the disease arrests itself for whatever reason we do not know_ then the individual recovers the seeming loss of function that he had only a little while ago.
Not_ infrequently these diseases are diagnosed variously in its early phases. They may be diagnosed even as hysterical or functional “nervous” and then later the disease as further exacerbation occurs then the nature of the disease becomes manifest. It particularly becomes manifest as one finds evidence that more than one site has been involved. Whenever we find that the individual symptoms cannot be explained as due to a lesion in one place like a tumor and it can be explained by discrete or disparate signs of pathology then we become more sure that we are dealing with multiple lesions Ob multiple sclerosis.
*510 In the period of remission the individual may be perfectly functional and have no symptoms whatsoever, particularly in the early phase. _
_ In the later periods of remission there is so much residual that while he may be better he still retains some residue of blindness or paralysis or disturbances of gait and balance, but in the early phases of the disease there is a complete remission of any symptoms and as far as the individual knows he is well and as far as anyone can tell and he returns to duty and his previous occupation.
* * ❖ * *
The fact that an individual may have a symptom which disappears is not enough to make the diagnosis of multiple sclerosis. One usually can only make the diagnosis after there have been several bouts or exacerba-tions of the illness which has left some residual and this indicates that the illness is coming from more than one site or pathology. Then one is reasonably certain that you are dealing with a relapsing or intermittent type of disorder which is coming from several places in the central nervous system. Then one can say that one is dealing with multiple sclerosis.
* * * ❖ #
* * * An individual may have a completely negative neurological examination in a stage of remission, particularly in the early phases of the disease.
16. Colonel Glass agreed with the following medical description of “Disseminated Sclerosis”:
Wilson: Neurology, 2nd Edition, Vol. 1 Ch. X— Disseminated Sclerosis.
[P. 170] The Disease thus named is distinguished by islets of sclerosis scattered throughout the central nervous system — not altogether, as we shall see, at haphazard, and by correspondingly variable syndromes. Recognition of the latter is now more general, diagnosis being made more frequently than when, influenced by the somewhat rigid schematization of Charcot, it was more or less restricted to what we should now regard as advanced forms of the Disease. Equally characteristic is the peculiar course run, marked by remission and relapses at short or long intervals; it is precisely this changeableness that has diagnostic value. Sooner or later the symptoms coalesce into a standard or “classical” syndrome — commonly if not unfailingly. So far as present knowledge goes, the malady is incurable, and *511 statements to the contrary must 'be received with reserve, but the conclusion may have to be qualified in one or two respects; these will be mentioned in their place.
[p. 177] Modes of onset
Early symptoms are often said to have appeared insidiously, but as there must always be a moment when a symptom first obtrudes itself it can with equal propriety be described as sudden; distinction between slowness and rapidity applies in general to evolution of more than one. In most instances concern is first awakened by symptoms of the following kind.
Paraesthesiae — xxxx
Useless Limb — xxxx
Initial symptoms. — The first symptom may be composed of “shaking” or “trembling” in limb or limbs, or a general “shakiness,” or consist of a “staggering” gait, insecurity in walking, “fumbling” or “awkward use” of fingers for fine movement, or wider defect of co-ordinate function; here may be included articulatory trouble.
Ocular signs — xxxx
Other symptoms — xxxx
These different groups comprise most of the symptoms at first observed by the patient; they occur in all sorts of ways — singly or in a variety of combinations, sometimes down one side, and so on; no order can be foreseen.
[p. 181] Eelapses and remissions, appearance of fresh symptoms, and the proclivity of different forms to blend as the disease advances, make calculation to type frequencies rather futile. So much hangs on the period at which examination is conducted that comparative figures are bound to diverge widely.
[p. 200-201] Differential diagnosis.
Formes frustes and localized syndromes are apt to be confused, the first with hysteria and the second with conditions of other origin. Diagnostic criteria include a diminished or lost abdominal reflex, early temporal pallor, fine nystagmus, and — no less significant — a minute anamnesis furnishing proof of changing symp-tomatology. In the presence of spastic paraplegia alone, double vision, toxic amblyopia, a cerebellar picture, or even Jacksonian fits, it may be impossible to decide; without evidence of dissemination diagnosis must be provisional. The aid lent by the spinal fluid formula quoted above is not procurable in every case.
*512 Time alone in not a few examples reveals the nature of the initial symptoms. It is well, however, to bear in mind the occurrence of localized types and thus avoid the pitfall of unneeded surgical exploration.
[p. 201-202] Course and prognosis
Broadly speaking, the disease is incurable, in the sense that no specific treatment has been discovered. Sooner or later it causes death in practically every instance, but its course is highly variable. In a small minority a rapid course is pursued; much more common is a slow advance, interrupted by spontaneous remissions that can endure for years; now and again the condition seems to be arrested, and what amounts to a virtual cure occurs. Inability to predict such a possible event, and ignorance of the factors underlying disappearance of symptoms, make it somewhat trying for the observer to express an opinion on the future in a given case. Improvement can be promised with confidence during early periods, unless symptoms are both acute and widespread — this naturally leads to hesitation; but some of the class eventually recover in large degree^ whereas a few cases begin insidiously yet advance quickly and show no remission.
Wechsler: GMnical Neurology, 8th Ed.
Extract
Multiple Sclerosis
[p. 530] Multiple sclerosis is a chronic, progressive disease syndrome of the central nervous system, or, rather, a series of syndromes based on several different causative factors. Its course is episodic in nature; that is, there is gradual progression with temporary remission, followed by further progress and other remissions until there is steady aggravation of all signs and symptoms. The clinical picture, as well as the course of the syndrome, are determined by two main pathologic features: (1) There are numerous and widespread patches or foci of sclerosis scattered throughout the central nervous system; (2) there is disintegration of the myelin sheath and preservation of the axis cylinder in the midst of most extensive patches of sclerosis. The axis cylinder is destroyed later, so that secondary degeneration occurs only after a long time. The destruction of the myelin sheath explains the partial impairment of function, while the preservation of the axis cylinder accounts for the possibility of remissions. It is only when both *513 are destroyed that the signs and symptoms become permanent.
[p. 535] Course. The course of the disease is chronic, progressive, with numerous remissions and exacerba-tions. The remission generally is a functional one, the organic signs rarely showing actual regression. The duration of the disease is from one or two to twenty years or more, the average (according to Bramwell) being seven to nine years. Acute types run a shorter course, and cases showing bulbar symptoms also progress fairly rapidly. The prognosis depends on the course of the disease and the underlying cause. The outlook as to life is not bad; as to recovery not favorable. Eemissions may last a long time or the disease may even remain stationary, but complete recovery is extremely rare. None the less there are benign cases. Many patients are ultimately incapacitated, they become bedridden, and some intercurrent disease leads to a fatal termination.
17. Dr. Glass also stated that there is no convincing evidence that military service per se contributes to, produces, or exacerbates multiple sclerosis. However, he did point out that, since the diagnosis of multiple sclerosis is a very serious one, with a poor prognosis, one does not make the diagnosis in either military or civilian life until one is reasonably sure such a condition exists.
18. Army Eegulation 605-250, dated January 16, 1948, provides at paragraph 30, in part, as follows:
Incapacity, character of, etc. — a. Character. — Incapacity for service by reason of physical disability relates to a permanent incurable disease, injury, or infirmity which prevents the reasonable fulfillment of the purpose of the officer’s employment. Such employment embraces the duties of his office in peace and war which are imposed by law, regulation, orders, or custom of the service.
Technical Manual 12-245, dated October 1,1945, provides, at paragraph 23, in part, as follows:
b. The word “disability” as used in section 5 of the act of 3 April 1939, as amended, with respect to retirement pay benefits means such disability as would constitute a basis for the retirement of Eegular Army Officer personnel. Thus, what constitutes “incapacity for active service” for Eegular Army officers likewise *514 constitutes “disability” for officers who are not Regular Army officers.
c. The question whether an officer of the Regular Army is incapacitated for active service is one of fact. An officer is incapacitated for active service when he is permanently physically or mentally incapable of performing full military duty, field as well as garrison, in both peace and war. * * *
19. Plaintiff applied for compensation from the Veterans Administration in June of 1950. A summary of action by the Veterans Administration is as follows:
* * * A rating in the claim on October 6,1950 granted service connection for the residuals of a transurethral resection of the prostate and assigned an evaluation 0% for that condition. * * * Service connection for the bladder condition was denied and findings of presbyopia and astigmatism were attributed to a developmental defect not compensable under the law. Reconsideration of the claim on July 24, 1951 based upon the report of physical examination dated June 20,1951 resulted in an evaluation of 20% for the prostatic condition under Diagnostic Code 7526. Following additional development and hospitalization, a rating dated November 20, 1952, granted service connection for multiple sclerosis with an evaluation of 80%. * * *
The rating was increased to 100 percent, effective January 24, 1956.
20. Plaintiff applied for physical disability retirement October 2, 1950, and was advised by the Secretary of the Army that his entire record had been reviewed by the medical authorities and the records failed to reveal the presence of any defect which was permanently incapacitating for general service while on active duty. It was accordingly determined that his appearance before a Physical Evaluation Board was not warranted.
21. In connection with plaintiff’s application for correction of his military records, dated September 20, 1954, he was authorized to report to the Valley Forge Army Hospital for a complete medical examination and appearance before a medical board at his own expense. A medical boai’d, convened on October 28, 1954, made the following findings and recommendation:
*515 [Item 16] 3480 Sclerosis, multiple Condition: Unchanged. LOD: Yes.
[17] Date became Incapacitated for Military Duty: 6 October 1954.
[18] Approximate Date of Origin of Each Incapacity: March 1948.
[19] Is Cause of Incapacity Incident to Service: Yes.
Degree of Disability for Military Service:
[23 Total.
[25] Permanent.
[34] The Board recommends that: LT COL James.D. Morrow be evaluated by a Physical Evaluation Board.
22. Plaintiff appeared before a Physical Evaluation Board on November 2, 1954. The Board considered plaintiff’s testimony to the effect that he experienced diplopia in March of 1948 and again some time in the latter part of 1948 or early 1949; that he had had a noticeable lack of bladder control since March of 1948, which had gradually increased; and that his ability to walk had become impaired. Captain O’Malley testified that he had examined the plaintiff and, as a result of the examination, diagnosed plaintiff’s condition as multiple sclerosis; that the diplopia experienced by plaintiff is considered characteristic of the disease, and that the onset of the disease may well have been in March of 1948. The Board made the following diagnosis, findings, and recommendation:
[Item 15] Sclerosis, multiple; unchanged. LOD: Yes. Degree of Severity: Moderate.
[16] Approximate date of origin or inception: March 1948.
[25, 26, and 28] Permanent, 30 percent disabling.
[31] The Individual became Physically Unfit to Perform the Duties of his Office, Bank or Grade on 6 October 1954.
[32] Recommendations * * * Permanent retirement with 30% disability.
23. The Army Board for the Correction of Military Records transmitted the proceedings of the medical board and the Physical Evaluation Board to the Surgeon General, with the request that such records be reviewed and an opinion given as to whether the evidence, now of record, would have *516 warranted applicant’s retirement for physical disability under the laws in effect at the time of his relief from active duty. The Surgeon General, under date of November 16, 1954, replied:
The finding of the physical evaluation board, 2 November 1954, Valley Forge Army Hospital, that Lt. Colonel James D. Morrow, 0-194757, at the time of separation from the service had a physical disability which would have warranted his retirement for such physical disability is concurred in.
As the Physical Evaluation Board found that plaintiff became unfit on October 6, 1954, and as the Surgeon General was specifically requested by the Board for the Correction of Military Records to express an opinion as to physical disability at the time of his relief from active duty, the response of the Surgeon General appears to be ambiguous, or at least not responsive, leaving unanswered the questions of (1) a concurrence in the entire findings of the Physical Evaluation Board, or (2) an independent determination by the Surgeon General as to a determination of unfitness as of the date of plaintiff’s release.
24. Plaintiff applied to the Board for the Correction of Military Records for correction of his records to reflect a discharge due to physical disability on July 31, 1948. The Board had before it the complete medical records, including the proceedings before the medical board, the Physical Evaluation Board, and the comments of the Surgeon General. The Board noted that the Physical Evaluation Board recommended that applicant be found physically unfit by reason of multiple sclerosis with approximate date of origin in March 1948, and that plaintiff became unfit to perform the duties of his office on October 6,1954, and that the Surgeon General, on November 16, 1954, concurred in the finding of the Physical Evaluation Board that “applicant had a physical disability at the time of his separation from the service which would have warranted his retirement for physical disability.” The Army Board for Correction of Military Records found:
1. That the applicant has exhausted all administrative remedies afforded him by existing law or regulations.
*517 2. That the Department of the Army records show:
a. that applicant was ordered to active duty training as a Lieutenant Colonel for the period from 6 October 1947 to 1 August 1948;
b. that he was treated for an eye condition in March 1948 and the report of his physical examination dated 8 July 1948 shows applicant qualified for general military service with waiver granted for defective vision;
c. that according to an opinion from the Surgeon General’s Office dated 24 October 1950 a review of the applicant’s records failed to reveal evidence that he had sustained any incapacitating medical defect while on active duty.
3. That on the basis of an opinion by the Surgeon General’s Office dated 13 August 1954, applicant was invited to appear before a Physical Evaluation Board; that a Physical Evaluation Board convened on 2 November 1954 recommended that applicant be found physically unfit by reason of sclerosis, multiple, with a disability rating of 30 per cent; that the approximate date of origin or inception of the incapacity was March 1948 and that applicant became unfit to perform the duties of his office, rank or grade on 6 October 1954.
H: # sj: H*
The Board Concludes:
1. That the applicant was not permanently physically disqualified for further military service at the time of his relief from active duty on 1 August 1948.
2. That although he may have been treated for a condition during this period of service which was later attributed as being the origin or inception of multiple sclerosis, it was not disabling to an extent which would have warranted his retirement for physical disability at that time.
3. That no error or injustice is shown in the applicant’s release from active duty, not by reason of physical disability, on 1 August 1948 under the laws, rules, regulations and policies then in effect.
The Board Recommends :
That, in the case of JAMES D. MORROW, his application for correction of military records dated 18 March 1953, be denied.
25. The Secretary of the Army approved the recommendation of the Army Board for the Correction of Military Records on February 10,1955.
*518 26. Colonel Glass, after studying the medical records relating to the period during the years 1947 and 1948, prior to the date of plaintiff’s release from active duty on August 1, 1948, stated that the sudden onset of diplopia, diagnosed as astigmatism, and plaintiff’s bladder condition (which the doctor felt was an enlargement of the prostate, a rather common condition) could have been early symptoms of multiple sclerosis or the beginning of that disease.
Examining the medical records in evidence for the year 1949, Colonel Glass expressed the opinion that late in 1949 it was clear that plaintiff had a central nervous system disease ; that the individual’s age and the fact that all the symptoms could be explained on the basis of one lesion in the brain stem, led the doctors to conclude that the best explanation for these symptoms was “something concerned with arterio-sclerotic disease,” which could have been compatible with multiple sclerosis. However, at that time, no one had ventured a diagnosis of multiple sclerosis.
Colonel Glass stated, relative to the medical records for the year 1950, that the same conditions continued, and “everyone agree[d] * * * that it [was] in all probability vascular”; that there was no indication of any suspicion of multiple sclerosis at that time.
In considering the medical records and evidence for the year 1951, the doctor stated that June 20, 1951, was the first time multiple sclerosis was considered. The examining doctor stated at that time: “That may still be cerebral vascular disease. Degenerative disease, multiple sclerosis must be considered.”
In examining and commenting upon the medical records in evidence for the year 1952, Colonel Glass stated that the first positive diagnosis of multiple sclerosis was made on January 16, 1952, and the diagnosis of the Veterans Administration of November 20, 1952, “multiple sclerosis with a valuation of 30 percent” is compatible with the present record. In the opinion of Colonel Glass, the clinical diagnosis of bladder neck obstruction made at the Germantown Hospital in 1953 was a part of the central nervous system disease and compatible with multiple sclerosis. On being asked to comment on the testimony of Dr. O’Malley before *519 the Physical Evaluation Board in 1954 relative to the onset of the disease in 1948, Colonel Glass stated that “onset” is taken in medicine to mean when the first manifestation of a disease is present.
27. The medical testimony, viewing the record in retrospect, after a definite diagnosis of multiple sclerosis in 1952, indicates that complaints of double vision in 1948 and bladder neck obstruction in 1948-1949 might be said to represent the onset of the disease.
28. When the diagnosis of multiple sclerosis is made, one is considered unfit for the service. However, the diagnosis cannot be definitely made early, and it may be several years before enough evidence accumulates to allow one to state that the disease is multiple sclerosis. The onset of the disease may be many years before the diagnosis can be established. With the remission of symptoms, the individual returns to duty, as was the case with plaintiff in 1948. It is not the severity of the onset — a severe onset may clear up completely. One cannot be retired on the basis of a symptom, but only on the basis of an established disease. In this case the first diagnosis of multiple sclerosis was made in January 1952, the Retiring Board found unfitness for duty as of October 1954, and the Veterans Administration granted service connection for multiple sclerosis as of November 20,1952. In the opinion of Colonel Glass plaintiff was fit for military duty at the time of his discharge on August 1, 1948; he was fit to perform the duties of his age, rank, and military speciality as of that date. Had plaintiff’s tour of duty not been terminated by the self-executing orders, plaintiff would have remained on active duty, and there would have been no occasion to bring him before a Retiring Board. However, plaintiff’s condition deteriorated in late 1949. Colonel Glass testified:
At this time and certainly by the date of this examination in November 1949 he would have been hospitalized and very likely not returned to duty, on the oasis of the findings of a central nervous system disease. It is perfectly clear the man has a central nervous system disease and he would not have been returned to duty.
*520 Before that time his symptoms were not particularly severe as far as can be determined here. We have a period of time in April of 1949 when the double vision returned and then we have another examination in November of 1949 so I know that in November of 1949 the findings are such that it would have precluded duty.
In the opinion of Dr. Glass, if the plaintiff had remained on active duty he would have been hospitalized by November 1949[3] and retired in 1950 for some central nervous system disease.
29. Plaintiff, a reserve officer, served on active duty training at the Military Police School for a period of approximately ten months from October 6, 1947, to August 1,1948, with provision in his orders for reversion to inactive duty status on the latter date.
His condition was first diagnosed as multiple sclerosis in January of 1952 and, in retrospect, it may be assumed that he had the first symptoms of this disease during his tour of duty at the Military Police School. His condition deteriorated to such an extent that, had he remained on active duty, he probably would have been retired for physical disability in early 1950 by reason of a central nervous system disorder.
He was able to complete his course of instruction at the school and was not unfit for duty at the time of his release in August of 1948.
It appears that this officer could have been retired by the Army on the basis of the symptoms, complaints, and findings made during the period from March 1948 to January 1952, viewed in retrospect at the time the record was considered by the Army Board for the Correction of Military Records. He was not retired. It cannot be said, on the basis of the complete record, that the decision of the Army Board for the Correction of Military Records and the Secretary of the Army in denying plaintiff’s application to change his records to reflect a retirement for physical disability on August 1, 1948, was arbitrary or capricious or not supported by substantial evidence.
*521 CONCLUSION OK LAW
Upon the foregoing findings of fact, which, are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is, therefore, dismissed.

 Plaintiff did not offer any oral testimony by a medical witness.

 This would be approximately 16 months after plaintiff was released from active duty.